**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| HEALTH DISCOVERY CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION,<br><br>Defendant. | C.A. No. _____<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF HEALTH DISCOVERY CORPORATION'S
COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Health Discovery Corporation ("Plaintiff" or "HDC"), by and through its undersigned counsel, files this Complaint for Patent Infringement against Defendant Nvidia Corporation ("Defendant" or "Nvidia") and alleges as follows:

**NATURE OF THE ACTION**

1.    This action seeks legal and equitable relief based on Nvidia's unlawful infringement of U.S. Patent No. 10,402,685 ("the '685 patent" or "Patent-in-Suit"), which generally relates to Recursive Feature Elimination Method Using Support Vector Machines for selecting features from a dataset to improve pattern recognition and classification tasks.

**PARTIES**

2.    Plaintiff HDC is a Georgia corporation with a principal place of business located at 900 Old Roswell Lakes Parkway, Suite 310 Roswell, GA 30076.

3.    Defendant Nvidia is a Delaware corporation with a principal place of business located at 2788 San Tomas Expressway, Santa Clara, CA 95051. Nvidia is a publicly traded company that may be served through its registered agent for service, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

**JURISDICTION AND VENUE**

4.      This is a civil action that arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*., including, but not limited to, 35 U.S.C. §§ 271 and 281. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

5.      The Court has both general and specific personal jurisdiction over Nvidia because Nvidia is a Delaware corporation, and continuously and systematically conducts business in the State of Delaware and in this judicial district.

6.      Nvidia has also purposefully availed itself of the benefits of this Court, having litigated, or currently litigating, cases before this Court, wherein Nvidia admitted proper venue and did not challenge personal jurisdiction. *See Twardzik v. HP Inc*., Civ. No. 1:21-cv-00396-SB, 2022 U.S. Dist. LEXIS 13131 (D. Del. January 25, 2022); *Visual Memory LLC v. NVIDIA Corp.*, Civ. No. 15-789-RGA, 2016 U.S. Dist. LEXIS 69543 (D. Del. May 27, 2016). Exercising personal jurisdiction over Nvidia in this patent infringement action comports with due process and traditional notions of fair play and substantial justice.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b), in that Nvidia is a Delaware corporation, is subject to personal jurisdiction in this judicial district and has committed acts of patent infringement in this judicial district.

**PATENT-IN-SUIT**

8.      On September 3, 2019, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 10,402,685 ("the '685 patent"), titled "Recursive Feature Elimination Method Using Support Vector Machines," in the names of Isabelle Guyon and Jason Weston. Plaintiff HDC is the ultimate assignee of the '685 patent. A copy of the '685 patent is attached hereto as Exhibit A.

9.      The Patent Trial and Appeal Board ("PTAB") declined to institute an *inter partes* review ("IPR") of the '685 patent in 2021.

10.    The '685 patent and a few of its related patents were asserted against Intel Corporation ("Intel") in 2020-2022, which cases were resolved in 2023. (*See* Paragraphs 49-54, *infra*.)

## BACKGROUND

11.    The inventors of HDC's Support Vector Machine-Recursive Feature Elimination ("SVM-RFE") patents,[1] Dr. Jason Weston and Dr. Isabelle Guyon, are world leaders in the field of machine learning. In the late 1980's, Dr. Guyon established herself as a leader in the field of artificial intelligence, collaborating at AT&T Bell Labs with renowned mathematicians Vladimir Vapnik and Bernard Boser on the invention of the support vector machine ("SVM"). Dr. Weston studied under Dr. Vapnik at Bell Labs while working on his PhD, awarded in 2000, where he also began working with Dr. Guyon on leading-edge innovations in machine learning. Today, Dr. Weston and Dr. Guyon are widely recognized as among the most influential scholars in the field.

12.    The first version of the manuscript of the paper that originally disclosed HDC's patented SVM-RFE technology, titled "Gene Selection for Cancer Classification Using Support Vector Machines," with Dr. Weston and Dr. Guyon as co-authors along with Stephen Barnhill and Vladimir Vapnik, was submitted for publication in the journal MACHINE LEARNING in 2000. Guyon, I., Weston, J., Barnhill, S., Vapnik, V., *Gene Selection for Cancer Classification Using Support Vector Machines*, MACHINE LEARNING 46, 389 (2002) (Ex. B, "Guyon paper"). This same manuscript was filed in the USPTO on March 22, 2000, as provisional application number 60/191,219, the application having the same title. (Ex. C, Zhang Dec., ¶¶ 24 and 25.)

---

[1]    These include U.S. Patent No. 7,117,188 (the "'188 patent"); U.S. Patent No. 7,542,959 (the "'959 patent"); U.S. Patent No. 8,095,483 (the "'483 patent"); and U.S. Patent No. 10,402,685 (the "'685 patent").

13.     In the years following publication of the Guyon paper, the Center for Biological and Computational Learning at MIT ("CBCL-MIT"), a major hub of artificial intelligence research and innovation, published several papers on the subject of using support vector machines for cancer classification. In each such publication, the CBCL-MIT credited Dr. Weston and Dr. Guyon as the source of SVM-RFE technology:

    a.     Ramaswamy, et al., in "Multiclass cancer diagnosis using tumor gene expression signatures," Proceedings of the National Academy of Sciences, 98(26):15149-15143 (2001), describes the use of SVM-RFE for feature selection, citing to the Guyon paper. (Ex. D.)

    b.     Rifkin, et al., "An Analytical Method for Multi-class Molecular Cancer Classification," SIAM Review, 45(4):706-723 (2003), describes the use of SVM-RFE. In the Rifkin paper, the CBCL-MIT recognizes and describes the distinctions between conventional linear SVM and SVM-RFE. (Ex. E.)

    c.     Similar discussions and distinctions between conventional SVM and SVM-RFE are offered by Mukherjee in "Classifying Microarray Data Using Support Vector Machines," Chapter 9 of Understanding and Using Microarray Analysis Techniques: A Practical Guide, Springer-Verlag, Heidelberg, 2003, pp. 166-185. (Ex. F.)

14.     The CBCL-MIT included researchers who were luminaries in their field. If they had thought Dr. Weston and Dr. Guyon's SVM-RFE was simply an insignificant variation of conventional SVM, they would not have consistently recognized Dr. Weston and Dr. Guyon's contribution of the SVM-RFE method. (Ex. C, Zhang Dec., ¶ 29.)

15.     Further evidence of the recognition and acceptance that SVM-RFE has achieved in the field is provided by the large number of academic publications that have cited the Guyon paper. The Guyon paper represented a significant portion of the invention disclosure for the

4

related HDC patents. A search for the Guyon paper using Google® Scholar, a web search engine that indexes the full text or metadata of scholarly literature, yields results indicating that from publication in 2002 to 2017, about 5,300 books, academic journals, conference papers, theses, technical reports, patents, and other publications have cited the Guyon paper as an authority in the field of SVM and feature selection. (Ex. C, Zhang Dec., ¶ 30.)

16.    An updated Google® Scholar search shows that, as of the date of this Complaint, the Guyon paper has been cited at least 13,258 times in books, academic journals, conference papers, theses, technical reports, patents, and other publications.

### HDC'S SVM-RFE TECHNOLOGY

17.    The '685 patent discloses pioneering technology that enhances the performance of learning machines, specifically SVMs, by enabling them to automatically identify the most relevant features in complex, high-dimensional data sets. The claimed invention of the '685 patent introduces a recursive training and elimination process that systematically ranks data features by their contribution to model accuracy and removes the least significant ones, a process known as Support Vector Machine-Recursive Feature Elimination. This approach allows a learning system not only to classify data, but to intelligently refine the data representation itself, thereby yielding a more efficient, interpretable, and generalizable model.

18.    SVMs are powerful mathematical learning systems that enable computers to detect subtle patterns in large and complex data sets. SVMs are known for their ability to discover hidden relationships in these complex data sets. By projecting data into a higher-dimensional space, SVMs can uncover relationships and boundaries that are not discernible through conventional statistical or neural network methods. SVMs, with the ability to handle what is known as infinite dimensional space, are broadly considered to be an improvement to neural networks and other mathematical techniques. SVM is a core machine learning technology with strong theoretical foundations and excellent empirical successes. SVMs have

become widely established as one of the leading approaches to pattern recognition and machine learning worldwide and have replaced other technologies in a variety of fields, including engineering, information retrieval, and bioinformatics.

19.    HDC's SVM-RFE innovation, conceived by Dr. Weston and Dr. Guyon as members of HDC's science team, extends the power of SVMs by integrating recursive feature ranking and elimination into the learning cycle itself. The method leverages the SVM's capacity to assign relative importance to input features (e.g., gene expression levels, image pixels, or signal characteristics) and iteratively refines the feature set by removing the least informative elements. This process continues until an optimal subset of discriminative features remains, providing a concise and highly predictive model. Originally developed to identify clinically meaningful biomarkers from genomic and proteomic data, the SVM-RFE framework has since become a foundational methodology for feature selection in modern machine learning. HDC's patented SVM-RFE technology teaches how the learning machine itself can improve by intelligently refining its inputs through recursive feature evaluation. The SVM-RFE process transforms feature selection from a manual or heuristic task into a mathematically driven, automated optimization loop. Modern machine learning systems that perform iterative feature ranking, pruning, or model refinement, such as those accelerated and deployed through NVIDIA RAPIDS cuML and associated software libraries, operate on this same principle of recursive elimination to enhance learning performance. Thus, while GPUs provide the computational substrate, the core innovation embodied in the '685 patent lies in the logic of how learning systems evolve toward optimal feature sets, a principle that underpins much of today's high-efficiency, GPU-accelerated AI pipelines.

20.    Nvidia's RAPIDS cuML implements at least advanced machine learning workflows that inherently mirror the recursive, feature-optimization paradigm pioneered by HDC's SVM-RFE technology. These frameworks allow developers to train models that

automatically evaluate, rank, and prune features or parameters based on their contribution to model accuracy or efficiency. Through GPU-accelerated parallel processing, Nvidia's systems repeatedly refine internal weight matrices, remove low-importance nodes or features, and update model parameters to achieve optimal performance—precisely the type of iterative feature-ranking and elimination process described and claimed in the '685 patent. In this way, the Nvidia RAPIDS cuML and its software stack operationalize recursive model refinement as a core element of GPU-accelerated training, embodying the same data-driven principle of intelligent feature selection that defines HDC's patented invention.

## HDC PATENT ELIGIBILITY

21.     The '685 patent relates to, *inter alia*, methods for using learning machines (Support Vector Machines). (Ex. A, '685 patent, 1:32-35.) The '685 patent invented such methods, for example, as automated knowledge discovery tools. The '685 invention is directed, for example, to allow the most advantageous application of the learning machine. Each training data point comprises a vector having one or more coordinates, and pre-processing the training data set may comprise identifying missing or erroneous data points and taking appropriate steps to correct the flawed data or as appropriate remove the observation or the entire field from the scope of the problem. (*Id.*, 3:25-4:67, 19:4-43.)

22.     An SVM is a classifier that attempts to map data sets to one of two groups or categories in such a way as to maximize the "distance" between the groups. (*Id.*, at 17:60-18:5.) This classification is based on one or more features of each data set. The SVM is first trained to perform the classification using examples with known outcomes (that is, examples that are known to belong to one group or the other). Once trained, the SVM can be used to classify data sets for which the proper group assignment is unknown. (*See generally id.*, at 2:15-33.) SVMs thus represent "a powerful tool to identify predictive models or classifiers, not only because they accommodate sparse data but also because they can classify groups or create predictive

rules for data that cannot be classified by linear decision functions." (Ex. B, Guyon paper, p. 390.)

23.    Although "powerful tools," SVMs are "complex" and historically, "SVMs were originally geared towards creating classifiers based on all available variables, and did not allow assessing variable importance." (*Id*.) Further, some classifiers are prone to "overfitting," particularly where the number of features in each example is large. (*Id*., p. 391.) Overfitting refers to a classifier that has been trained such that while it very accurately separates a set of training patterns into the correct categories, it does not generalize well to new examples. (Ex. A, '685 patent, 2:34-55.)

24.    Reducing the number of features relied upon for the classification is one approach for reducing the risk of overfitting a classifier, (Ex. B, Guyon paper, p. 390), however, designing an optimal feature reduction approach for a particular classifier is a challenging problem that requires insights about the "heuristics, biases, and tradeoffs" of the classifier, the types of patterns being classified, and how these factors interact. (Ex. G, Kohavi et al., *Wrappers for feature subset selection*, ARTIFICIAL INTELLIGENCE 97, 273 at Abst. (1997).)

25.    By 2018, "there [were] three categories of methods to assess importance of variables in SVM: filter, wrapper, and embedded methods." (Ex. H, Sanz, H., Valim, C., Vegas, E., et al., *SVMRFE: selection and visualization of the most relevant features through non-linear kernels*, BMC BIOINFORMATICS 19, 432, 433 (2018).) "The gold standard of wrapper methods is recursive feature elimination (RFE) proposed by Guyon et al." (*Id*.) It is this "gold standard" that is described and claimed in the '685 patent

26.    The SVM-RFE process can be understood with reference to Figure 2 of the '685 patent, reproduced below. Briefly, in method 200, a training data set is collected at step 203 and is applied to an SVM with a selected decision function or kernel at step 208. The kernel is a function that maps inputs to a required output to arrive at the classification of the input.

Different kernels will cause an SVM to produce varying degrees of quality in the output for a given set of input data. At step 210, the SVM is trained using the training data to generate an optimal hyperplane (that is, an optimal separation of the classes). Then, at step 216 a determination is made as to whether the SVM was trained in a desirable manner. Based on the conclusion, the kernel selection may be adjusted (steps 222, 224) and the process repeated from step 208 using the training data. When a desired training has been achieved, the method advances to step 226, where live data is collected and subsequently applied to the modified, since-trained SVM for classification. (Ex. A, '685 patent, 9:29-11-17.)



FIG. 2

27.     The invention described in the '685 patent is particularly concerned with the problem of "feature selection." (Ex. A, '685 patent, 19:4-43.) The "features" are the components of an input data set. (*Id.*, 15:18-20.) Feature selection is the process of reducing the number of input variables when developing a predictive model, e.g., a classifier such as a support vector machine. Feature selection is premised on the notion that the data being evaluated contains some features that are either redundant or irrelevant and can thus be removed without incurring much loss of information. It is desirable to reduce the number of input variables to both reduce the computational cost of modeling and, in some cases, to improve the performance of the model. When the number of features is very large, comprehensive feature selection techniques are impractical, (*id.*, 2:63-3:6), so the inventors of the '685 patent devised a technique "to use the weights of a classifier to produce a feature ranking with an SVM." (*Id.*, 17:57-60; *see also id.*, 19:4 *et seq.*) That technique employed recursive feature elimination (RFE), a term coined by the inventors, in which the classifier is trained, a ranking criterion for the features is computed, and the features with the smallest ranking criteria are recursively eliminated. (*Id.*, 17:39-49; *see also id.*, 19:4 *et seq.* (providing a pseudocode sequence for the application of RFE to an SVM using feature weight magnitude as a ranking criterion).)

28.     Summarized at a high level, SVM-RFE is a process for improving an SVM as a tool for classification of data. An SVM is used to classify examples of data (called patterns) drawn from two categories into the appropriate category. (*Id.*, 18:24-46.) Each pattern is made up of a set of features and the SVM finds a separation that divides the patterns into the two categories based on the content of the features. (*Id.*) The SVM-RFE process involves recursively pruning away those features that contribute the least to the classification decision. (*Id.*, 29:28-30.) The result yields an SVM that can classify a new pattern using a reduced set of

features. (*Id.*, 27:25-32.) The feature pruning is performed on the basis of ranked feature weights of the classifier. (*Id.*, 19:4-6.)

29.    Using one example from the '685 patent, a scientist may wish to identify the genes involved in colon cancer. (*Id.*, 14:55-15:16; 21:47.) In this example, the inventors considered 62 patterns, each pattern representing 2,000 genetic measurements of a single patient. (*Id.*, 21:49-58.) Each feature was a gene expression value indicating a magnitude for that gene's activity in the patient. *Id.* The classes represented the disease outcome for the patient—i.e., whether the patient had colon cancer or not. SVM-RFE was used to discover four genes predicted to be involved in the genetic mechanism of colon cancer. (*Id.*, 26:13-25.) SVM-RFE is particularly useful in cases like this where the patterns represent a large array of features, but it is not known which subset of the features are responsible for the example's membership in a category (here, the corresponding patient's disease outcome of colon cancer or not) (*See id.*).

30.    In SVM-RFE, not only does the technique yield a classifier that avoids overfitting, but the pruning process efficiently reveals relevant features and is responsive to the case where subsets of features contribute differently to the classification, rather than assuming all features are independent. (*Id.*, 25:56-26:13; 17:33-38.) For example, certain subsets of genes do not have independent activity, and the activities of certain genes may be correlated with a particular classification in a training set while having limited relevance to the biological mechanism of interest. (*See, e.g.*, *id*, 16:23-28.) Importantly, SVM-RFE allows researchers to not just obtain a more efficient classifier that makes accurate classifications using a reduced set of features, but also to understand why the classifier would make a particular classification. In this regard, SVM-RFE yields the importance of particular features to the classification, providing a concrete result for researchers and permitting further investigation of those leads.

31.    These technical advantages have led SVM-RFE to become a foundational method in modern machine learning. Even third-party sources, such as cited references of Intel in prior proceedings, have recognized the continued significance of the Guyon and Weston invention. Citing the seminal 2002 Guyon paper as reference 12 in the passage below, a 2014 article by Huang et al. favorably compares SVM-RFE to other methods of feature selection:

> The common methods of feature selection include backward feature selection (BFS), forward feature selection (FFS), and ranker [11]. Another feature selection method, support vector machine recursive feature elimination (SVM-RFE), can filter relevant features and remove relatively insignificant feature variables in order to achieve higher classification performance [12]. The research findings of Harikrishna et al. have shown that computation is simpler and can more effectively improve classification accuracy in the case of datasets after SVM-RFE selection [13–15].

Huang, et al., *SVM-RFE Based Feature Selection and Taguchi Parameters Optimization for Multiclass SVM Classifier*, The Scientific World Journal, Vol. 2014, Article ID 795624 (2014).

32.    The asserted claims are directed to a specific, computer-implemented sequence that modifies the classifier's internal kernel representation. Claim 1 recites ordered operations that: (i) compute feature values from a trained SVM; (ii) eliminate the lowest-ranked feature(s); (iii) transform the classifier by subtracting a matrix from the kernel data to produce updated kernel data; (iv) update feature values based on that transformed data; and (v) iterate until a target feature set remains, after which the modified classifier is used to recognize new data. This step-specific transformation yields a learning machine that operates differently—a technological improvement, not generic data analysis. Under step one of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), the claims thus fall squarely within the realm of patent-eligible subject matter because they recite a specific improvement to the functioning of a computer-implemented learning system.

33.    Method claim 1 of the '685 patent recites:

| NO. | LIMITATION |
|-----|------------|
| 1. | A method, comprising: retrieving training data from one or more storage devices in communication with a processor, |
| 2. | the processor operable for: determining a value for each feature in a group of features provided by the training data; |
| 3. | eliminating at least one feature with a minimum ranking criterion from the group, |
| 4. | wherein the minimum ranking criterion is obtained based on the value for each feature in the group; |
| 5. | subtracting a matrix from the kernel data to provide an updated kernel data, |
| 6. | each component of the matrix comprising a dot product of two of training samples provided by at least a part of the training data that corresponds to the eliminated feature; |
| 7. | updating the value for each feature of the group based on the updated kernel data; |
| 8. | repeating of eliminating the at least one feature from the group and updating the value for each feature of the group until a number of features in the group reaches a predetermined value to generate a feature ranking list; and |
| 9. | recognizing a new data corresponding to the group of features with the feature ranking list. |

34.    Defendant Nvidia infringes, at least, representative method claim 1 of the '685 patent through its GPU-accelerated machine-learning stack, including RAPIDS cuML and the associated cuml.accel module, which together execute scikit-learn pipelines on Nvidia GPUs with minimal or no code changes. Nvidia publishes, promotes, and instructs developers to use workflows such as RFE(SVC(kernel="linear")) and RFECV(SVC(kernel="linear")) under cuml.accel, causing the underlying SVM fits, refits, feature-ranking computations, feature eliminations, and kernel updates to run on Nvidia's cuML SVM implementations (e.g., LinearSVC or a linear-kernel SVC). When executed as taught by Nvidia, these workflows perform each step of the patented method, i.e., retrieving training data; computing per-feature values during SVM training; eliminating the lowest-ranked features based on those values; updating kernel/Gram relationships through refitting (including literal rank-one updates for

linear kernels or equivalents); recomputing an updated kernel matrix with the eliminated features removed; repeating the elimination-and-refit loop until the specified feature count is reached; and finally using the resulting feature-ranked SVM to classify new data. Evidence for each exemplar workflow includes capture date, library versions, URLs, and highlighted screenshots of relevant NVIDIA publications. (*See* Ex. J, Preliminary Infringement Claim Chart re: U.S. Patent 10,402,685, method claim 1.)

35.     Specifically, representative method claim 1 of the '685 patent recites a computer-implemented method that begins with retrieving training data from one or more storage devices in communication with a processor. (Ex. A, '685 patent, claim 1, limitations 1-2.) The training data includes multiple features, the measurable components of each example in the data set. The SVM is defined by a particular decision function or kernel, which determines how data points are separated into categories.

36.     The subsequent limitations 3-7 describe how that decision function is systematically modified through a series of concrete computational steps. First, the method determines and ranks the contribution of each feature to the classifier's decision boundary, computing a ranking criterion for each based on its corresponding feature value. The feature with the lowest ranking criterion is then removed from the set. The process next performs a matrix subtraction operation, "subtracting a matrix from the kernel data to provide an updated kernel data," which mathematically alters the kernel representation of the SVM. This operation produces a new, updated SVM that differs from the original classifier, with an adjusted decision boundary that reflects the elimination of uninformative feature. (Ex. A, '685 patent, claim 1, limitations 3-7.)

37.     As recited in limitations 8-9, the process iterates the steps of repeating feature ranking, elimination, and kernel updating, until a predetermined number of features remains. This recursive sequence generates a feature ranking list and results in a fully refined, optimized

classifier. Finally, the updated SVM is used to recognize or classify new data based on this optimized feature set. In effect, the claimed method transforms the SVM during execution: it begins with an unrefined, general-purpose classifier and ends with a specialized, data-optimized learning machine. The invention thus improves the operation of the SVM itself, enhancing both computational efficiency and classification accuracy in a way that could not previously be achieved through conventional training techniques. (Ex. A, '685 patent, claim 1, limitations 3-7.)

38.     Unlike a situation in which certain information is selected, analyzed, and then reported or results of the analysis displayed, method claim 1 of the '685 patent recites actual improvements in/modifications to the tool (in particular, the SVM classifier) that is used to perform the analysis. While the process of that improvement is algorithmic in nature, the claim is not merely an improvement of a mathematical technique. Rather, it is an improvement in the functionality of a physical-world instrument with real-world outcomes—namely the SVM classifier. The SVM that is the result of the modification process is one that is specially crafted by including only the subset of features of pre-determined size that has been determined through the recited optimization process. This is distinct from claims found to be directed to abstract ideas which only provide data of an improved quality or nature. Here, it is not the data that is improved, rather it is the machine used to analyze the data that is improved. Thus, the claimed invention does not simply yield better data or a more accurate model output but it improves the machine that performs the analysis itself. This is a quintessential example of a technological improvement rather than an abstract idea.

39.     Furthermore, method claim 1 of the '685 patent involves more than the performance of well understood, routine, and conventional activities previously known to the industry. The technique for improving a support vector machine that is recited in this claim affords two advances. First, use of ranked criterion enables an efficient process for eliminating

features by using parameters already computed during the training of the underlying SVM classifier. Second, the ranked criterion provides users of the process with insight into the relevance of various features to the classification itself. In developing this process, the inventors made a clever and novel choice – they realized that the parameters computed during the training of the SVM could be very efficiently used to compute a different parameter – the "ranking criterion" – that was correlated with the contribution of a feature to the SVM classification. The inventors made a non-obvious conceptual leap recognizing that the internal parameters computed during SVM training could be repurposed to derive a secondary metric, i.e., the ranking criterion, that correlates with each feature's contribution to classification accuracy. This realization transformed how SVMs could be optimized.

40.    As noted above, although they are powerful tools, SVMs had only limited initial popularity among researchers as they are complex and were originally geared towards creating classifiers based on all available variables and did not allow assessing variable importance. The process of improving an SVM recited in method claim 1 of the '685 patent addressed both drawbacks. First, the process creates an SVM that operates effectively on fewer than all available variables through feature elimination according to ranked criterion. Second, the process allows assessment of variable importance because the ranking uses parameters computed during the training of the underlying SVM classifier. That is, the recited process necessarily provides a ranked list with variables ordered according to their relevance, as explicitly set forth in the claims. The process also provides overall efficiencies because it avoids the need to retrain the classifier for every candidate variable to be eliminated. This reduces the computational burden associated with other feature elimination techniques. These techniques and advantages were not well-understood, routine, or conventional activities previously known to the industry. This dual improvement, both in computational performance

and explainability, was neither conventional nor routine in the art and represents a meaningful advancement in the design and use of machine-learning classifiers.

41.     Accordingly, even if the Court were to determine that method claim 1 is directed to an abstract idea under *Alice* step one, the specific inventive concepts described above (¶¶ 31–39) render the claim patent-eligible under *Alice* step two. Method claim 1 recites a non-conventional sequence of computer-implemented steps that effectuate a technological improvement in a specific class of machine-learning tools. That is, the kernel update during iterative elimination, coupled with the ordered feedback loop of re-ranking and re-fitting, was not routine or conventional and produced a classifier with a different internal state and improved computational behavior.

42.     Representative method claim 1 does not merely use an SVM to process data—it changes how the SVM itself operates and learns, thereby improving the functioning of a computer system and its capacity to perform complex classification tasks efficiently.

## EXEMPLARY USES OF SVM-RFE FOR MEDICAL AND NON-MEDICAL APPLICATIONS

43.     The use of RFE to modify the SVM can be applied to both medical and non-medical applications. One exemplary medical application consisted of developing an improved cardiac monitoring method based on supervised learning methods, to be able to distinguish healthy from pathologic arterial pulse waves ("APW"), and those two from noisy waveforms (non-relevant segments of the signal). The APW data set analysis was composed of signals acquired in a clinical environment from a total of 213 subjects, including healthy volunteers and non-healthy patients. The signals were characterized by 39 pulse features, including morphologic, time domain statistics, cross-correlation features, and wavelet features. SVM-RFE was used to select the most relevant features. A comparative study was performed to evaluate the performance of the two classifiers: SVM-RFE and Artificial Neural Network ("ANN"). The SVM-RFE method achieved a statistically significant better performance for

this problem compared to ANN. This study showed a support vector machine modified according to the SVM-RFE method was able to differentiate those three important signal outcomes (healthy, pathologic, and noise) and to reduce bias associated with clinical diagnosis of cardiovascular disease using APW. (Joana S. Paiva et al., *Supervised learning methods for pathological arterial pulse wave differentiation: A SVM and neural networks approach*, INTERNATIONAL JOURNAL OF MEDICAL INFORMATICS 109 (2018) 30-38, https://pubmed.ncbi.nlm.nih.gov/29195703/ (last accessed October 13, 2025).) In this case, the claimed invention produced an improved classifier for the clinical diagnosis of cardiovascular disease.

44.    In a non-medical application, the SVM-RFE method was used to develop an SVM to select for milk rancidity to solve the multi-class milk selection problem. An "artificial nose" sensor array, coupled with feature extraction and pattern recognition methods, was used to obtain selective discrimination of milk of different rancidity levels. The multi-class classifier model based on SVM-RFE resulted in an accurate classification with a reduced feature set. (Amari, et al., *Classification of a Portable Electronic Nose Data with SVM-RFE Method: Application to Milk Rancidity*, IEEE SENSORS 2008 CONFERENCE, https://warwick.ac.uk/fac/sci/eng/research/grouplist/sensorsanddevices/mbl/database/ ieeesensors08/PDFs/Papers/113_6651.pdf (last accessed October 13, 2025).) In this case, the claimed invention produced an improved classifier for milk rancidity levels.

45.    In another non-medical example, SVM-RFE was used to produce an SVM to assess the quality of beef. Each piece of meat was described by 147 attributes, including weight of the animal, breed (7 boolean attributes), aging, 6 physical attributes describing its texture, and 12 sensory traits rated by 11 different experts. By using the SVM-RFE method, researchers were able to narrow down the subset of features to provide an SVM that accurately classified the data. (Del Coz, et al., *Trait selection for assessing beef meat quality using non-linear SVM*,

18

NIPS (2004), https://citeseerx.ist.psu.edu/viewdoc/download?doi= 10.1.1.1010.9232&rep=rep1&type=pdf (last accessed October 13, 2025).) In this case, the claimed invention produced an improved classifier for assessing the quality of beef.

46.     Another example relates to the field of steganography, which is the technique of secretly embedding additional information in digital products. Such embedded information raises the potential for covert dissemination of malicious software, mobile code, or other information. To combat the threat posed by steganography, steganalysis aims to expose the stealthy communications. To handle the large number of developed features, SVM-RFE feature selection was used. Initially, there were 3950 features describing the data set for all the images used in the experiments. The results demonstrate that even when the ultimate subset of features of an SVM determined by RFE is reduced by 95.1% to 99.4% of the original number of features, accurate classification results were still obtained. (Liu, et al., *An improved approach to steganalysis of JPEG images*, INFORMATION SCIENCES 180 (2010) 1643-1655, https://www.shsu.edu/~qxl005/New/Publications/INS_jpegsteg.pdf (last accessed October 13, 2025).) In this case, the claimed invention produced an improved classifier for assessing the presence of steganographically embedded information.

47.     Pre-harvest soybean yield classifications and estimations are another example benefiting from SVM-RFE. Such classifications and estimations are important for grain policy making and food security worldwide. The potential soybean yields are estimated based on spectral reflectance, which is considered an efficient phenotyping tool that can help breeders to make their selections at lower cost at a fast pace. The study used 62 spectral reflectance bands as the full variables and the RFE method was used to produce a classifier that operated on the 21 most important bands to facilitate the study. The smaller feature subset still provided an efficient and effective solution. (Yoosefzadeh-Najafabadil, et al., *Application of Machine Learning Algorithms in Plant Breeding: Predicting Yield From Hyperspectral Reflectance in*

*Soybean*, FRONTIERS IN PLANT SCIENCE, 12 January 2021, https://www.frontiersin.org/articles/10.3389/fpls.2020.624273/full (last accessed October 13, 2025).) In this case, the claimed invention produced an improved classifier and estimator for assessing the soybean yields.

## Litigations Against and Settlement With Intel

48.     In 2019, a grandparent of the '685 patent and HDC prevailed over Intel's U.S. Patent No. 7,685,777 (filed in 2005) titled "A Recursive Feature Eliminating Method Based on a Support Vector Machine" in an interference proceeding before the USPTO.

49.     In 2020, Plaintiff HDC asserted claims of infringement of the '685 patent and a few of its family members against Intel in the U.S. District Court for the Western District of Texas; *Health Discovery Corporation v. Intel*, Civ. No. 6:20-cv-00666-ADA (W.D. Tex., filed July 23, 2020) ("2020 infringement action").

50.     In the 2020 infringement action, Intel prevailed on a Rule 12(b)(6) motion to dismiss under 35 U.S.C. § 101, which HDC appealed to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit").

51.     In February 2021, Intel requested an IPR of the '685 patent over many of the historical articles cited above in explaining the technology, which the PTAB declined to institute. (*See* PTAB-IPR2021-00555.)

52.     While the appeal of the earlier 2020 infringement action was still pending, HDC filed a new infringement action in the Western District of Texas against Intel in April 2022 asserting infringement of the '685 patent and a few of its family members; *Health Discovery Corporation v. Intel*, Civ. No. 6:22-cv-00356-ADA (W.D. Tex., filed April 4, 2022) ("2022 infringement action").

53.     In May, 2022, the Federal Circuit dismissed the appeal and remanded the 2020 infringement action back to the Western District of Texas in accordance with Rule 42(b) of the

Federal Rules of Appellate Procedure. *Health Discovery Corp. v. Intel Corp.*, Civ. No. 2022-1446, 2022 U.S. App. LEXIS 14402 (Fed. Cir. May 26, 2022). The remanded 2020 infringement action was consolidated with the newly filed 2022 action under the 2022 civil action no. 6:22-cv-00356-ADA. Intel again filed a Rule 12(b)(6) motion to dismiss under 35 U.S.C. § 101, which HDC opposed. (Ex. I.) The parties settled their ongoing disputes globally while this motion was pending.

54.    After over a decade of continuous disputes before the USPTO and courts, HDC and Intel resolved their disputes in September 2023. (2022 infringement action, D.I. 76.)

## COUNT I – PATENT INFRINGEMENT

55.    Plaintiff HDC incorporates by reference and realleges Paragraphs 1-54 of its Complaint, and further incorporates by reference the Preliminary Infringement Claim Chart re: U.S. Patent 10,402,685 for method claim 1 (Ex. J), as though both are fully set forth herein.[2]

56.    The '685 patent expired on or about June 27, 2025.

57.    The '685 patent is presumed to have been valid pursuant to 35 U.S.C. § 282.

58.    Plaintiff HDC is asserting only the method claims of the '685 patent against Defendant.

59.    Plaintiff HDC has never marketed or commercialized any method or article covered by the '685 patent and is therefore not subject to the provisions of 35 U.S.C. § 287.

60.    Upon information and belief, licensee Intel has never marketed or commercialized any method or article covered by the '685 patent.

61.    Plaintiff HDC is the owner by assignment of all right, title, and interest in the '685 patent, including all right to recover past damages for any and all infringement thereof.

---

[2]  The allegations of this Count are exemplary only and without prejudice to HDC's infringement contentions. In providing these allegations, HDC does not convey or imply any particular claim constructions or the precise scope of the claims. HDC's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order, standing orders, default standards, and local rules.

62. The '685 patent has been cited one hundred nineteen (119) times per Google patents.

63. Upon information and belief, all of Defendant's infringing activities are controlled by Nvidia entities located within the United States and occur within the United States.

64. Nvidia is not and never has been licensed or authorized to make, use, sell, offer to sell, or import any product or service that is covered by the claims of the '685 patent.

65. Upon information and belief, Nvidia has directly and indirectly infringed, either literally or under the doctrine of equivalents, one or more claims of the '685 patent in violation of 35 U.S.C. § 271(a), including but not limited to method claim 1, every time Nvidia makes, uses, offers to sell, or sells RAPIDS cuML. (*See* Ex. J, Preliminary Infringement Claim Chart re: U.S. Patent No. 10,402,685, method claim 1.)

66. Upon information and belief, Nvidia's infringement of the '685 patent has been willful, deliberate, and intentional.

67. Nvidia's infringing activities are damaging Plaintiff HDC in an amount to be determined at trial.

68. Additionally, the willful and deliberate nature of Nvidia's infringing activities entitles Plaintiff to recover trebled actual damages and to recover its attorneys' fees and costs incurred in this action.

## JURY DEMAND

69. Plaintiff demands a trial by jury on all issues presented in this Complaint so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks this Court to enter judgment against Defendant Nvidia, Nvidia's subsidiaries, affiliates, agents, servants, employees, and all persons in active concert or participation with Nvidia, and grant the following relief:

(A)    A finding that Defendant Nvidia has directly and indirectly infringed one or more claims of the '685 patent;

(B)    An award of damages adequate to compensate Plaintiff for Defendant Nvidia's infringement of the '685 patent under 35 U.S.C. § 284;

(C)    A determination that Defendant Nvidia infringement of the '685 patent has been willful and deliberate;

(D)    A determination that this action is "exceptional" under 35 U.S.C. § 285, thereby entitling HDC to an award of its reasonable attorneys' fees and costs incurred in prosecuting this action;

(E)    An award of enhanced damages under 35 U.S.C. § 284 of treble damages based on the willful and deliberate nature of Defendant Nvidia's infringement;

(F)    An award of pre-judgment and post-judgment interest on all damages computed;

(G)    An award of court costs and attorneys' fees as allowed by applicable law; and

(H)    Such other relief as this Court deems fair, just, and appropriate.

Date: December 31, 2025

OF COUNSEL:

P. Branko Pejic (*pro hac vice forthcoming*)
Jill M. Browning (*pro hac vice forthcoming*)
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
(703) 716-1191
bpejic@gbpatent.com
jbrowning@gbpatent.com

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (No. 110)
David A. Bilson (No. 4986)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington DE, 19806
Phone: (302) 655-4200
JCP@PMHDELaw.com
DAB@PMHDELaw.com

*Counsel for Plaintiff Health Discovery
Corporation*